**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

ARNOLD S. ADAMS,

      Plaintiff,

v.                             CASE NO.: _____

THE FLORIDA DEPARTMENT
OF CORRECTIONS, an agency
of the State of Florida,

      Defendant.

_____/

## **COMPLAINT**

Plaintiff, ARNOLD S. ADAMS, by and through the undersigned counsel, hereby sues the Florida Department of Corrections ("FDC"), and alleges as follows:

### **INTRODUCTION**

1.     This is a civil rights action for monetary damages. Plaintiff is an inmate incarcerated in Defendant FDC's prison system. Plaintiff is suing Defendant FDC for deliberating depriving him of medically necessary treatment for hepatitis C. Specifically, Plaintiff sues FDC for intentionally discriminating against him on the basis of disability in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the U.S. Constitution.

3.     Venue is proper in the Northern District of Florida, Tallahassee Division, as Defendant FDC is headquartered with its principal place of business in Tallahassee, Florida and a substantial part of the events or omissions giving rise to Plaintiffs claims occurred in the Northern District of Florida. *See* 28 U.S.C. § 1391.

4.     The claims alleged herein are brought within the applicable statute of limitations.

5.     Plaintiff has complied with all conditions precedent and has fully and properly exhausted all administrative remedies prior to filing this action. Alternatively, Plaintiff alleges that administrative remedies were unavailable to him and therefore need not be exhausted prior to filing suit.

## THE PARTIES

6.     Plaintiff is an inmate incarcerated in Defendant FDC's prison system. He has been incarcerated since October 30, 2009. Throughout his incarceration, Plaintiff has been housed, and was denied treatment for his HCV, at numerous prisons owned and operated by Defendant FDC, including Central Florida Reception Center ("CFRC"), Hamilton Correctional Institution ("Hamilton CI"), Union Correctional Institution ("Union CI"), and Reception and Medical Center ("RMC").

7.     Defendant FDC is an agency of the State of Florida that owns and operates correctional facilities throughout the State, including every prison where Plaintiff was housed and denied treatment for his HCV throughout his incarceration, and receives federal funds to operate its agency. Defendant FDC is headquartered in Tallahassee, Florida. Defendant FDC is responsible for the medical care of all individuals confined in its prison system. Further, FDC is responsible for overseeing the operations of its medical contractors. FDC discriminated against Plaintiff—a qualified individual with a disability due to his infection with chronic HCV—by deliberately depriving him of medically necessary treatment for his chronic HCV.

8.     At all times relevant hereto, FDC had a non-delegable duty to provide constitutionally-adequate medical care to all prisoners in Florida.

## FACTS

### Background Information on Hepatitis C

9.     Hepatitis C is a blood borne disease caused by the hepatitis C virus ("HCV"). The virus causes inflammation that damages liver cells and is a leading cause of liver disease and liver transplants.

10.     HCV can be either acute or chronic. In people with acute HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure. Chronic HCV, on the other hand, is defined as having a detectable HCV

viral level in the blood at some point six months after exposure. Fifty (50) to eighty (80) percent of infected people will develop chronic HCV.

11.    Liver inflammation caused by chronic HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, fighting infection, and conducting other metabolic processes in the body. Liver inflammation can also cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.

12.    People with chronic HCV develop fibrosis of the liver, a process by which healthy liver tissue is replaced with scarring. When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis. Scar tissue cannot perform the job of normal liver cells, so fibrosis reduces liver function and results in the same symptoms mentioned above, but with greater intensity. Fibrosis can also lead to liver failure and hepatocellular carcinoma (liver cancer).

13.    The amount of liver scarring a patient has is usually measured on the METAVIR scale. On this scale, a person can be classified F0 (no fibrosis), F1 (mild fibrosis), F2 (moderate fibrosis), F3 (severe fibrosis), or F4 (cirrhosis).

14.    Among those with chronic HCV, the majority will develop progression liver disease and approximately 20% will develop cirrhosis in a 20-year timeframe. Patients with rapid fibrosis liver progression may reach cirrhosis within as short a timeframe as one year.

15.     Cirrhosis causes additional painful complications, including widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst), easy bruising, ascites (fluid accumulation in the legs and abdomen), encephalopathy (mental confusion and disorientation), lymph disorders, increased risk of infection, seizures, and extreme fatigue. Most of these complications can occur before cirrhosis. If they go untreated, some can cause death, often from infection, bleeding, and fluid accumulation.

16.     Abdominal ascites can require paracentesis, a procedure wherein a needle is inserted into the abdomen to drain the fluid. Without this periodic procedure, the fluid accumulation can decrease the available space for the patient's lungs, thus causing shortness of breath and difficulty breathing.

17.     Moreover, once an HCV patient's liver has cirrhosis, it may not be reversible. Some patients with cirrhosis may have too much scar tissue in the liver, even if the liver can heal to some degree once the virus is eliminated by treatment. If scar tissue persists, the patient may still experience the complications of cirrhosis, including liver cancer.

18.     Chronic HCV is, as a matter of law, a serious medical need. *See Mitchell v. Nobles*, 878 F.3d 869, 876 (11th Cir. 2017).

19.     Plaintiff's disabling condition was chronic HCV. In other words, Plaintiff's "disability" was chronic HCV, as defined under the ADA and RA.

### General Prevalence of HCV

20.     Approximately 2.7 to 3.9 million Americans have chronic HCV.

21.     In 2000, the United States Surgeon General called HCV a "silent epidemic," and estimated that as much as two percent of the adult U.S. population had HCV.

22.     In 2013, HCV caused more deaths than sixty other infectious diseases combined, including HIV, pneumococcal disease, and tuberculosis.

23.     Approximately 19,000 people die of HCV-caused liver disease every year in the United States.

24.     HCV is the leading indication for liver transplants in the United States.

### HCV in Prison

25.     The prevalence of HCV in prison is much higher than in the general population. It is estimated that between 16% and 41% of the United States' jail and prison population has HCV. Thus, incarceration is a risk factor for HCV.

26.     Defendant FDC has reported to the media and researchers that 5,000 to 5,272 of its approximately 98,000 inmates have HCV. As of August 8, 2016, Defendant FDC listed 4,797 inmates as having HCV in its internal records. As of

late-2017, it was estimated that FDC had knowledge of at least 7,000 inmates who were infected with HCV.

27.    In fact, because it is estimated that between 16% and 41% of incarcerated people have HCV, it is likely that between 14,700 and 40,184 FDC inmates have HCV. The true number is likely at the higher end of that spectrum because of the high prevalence of HCV in Florida: Between 2009 and 2013, rates of acute HCV in Florida increased by 133%.

## Standard of Care for HCV

28.    For many years, there were no universally safe and effective treatments for HCV. The standard treatment prior to 2011, which included the use of interferon and ribavirin medications and sometimes required injections, had a long treatment duration (up to 48 weeks), failed to cure most patients, and was associated with numerous side effects, including psychiatric and autoimmune disorders, flulike symptoms, gastrointestinal distress, skin rashes, and severe anemia. Moreover, not all drug regimens worked for all types of HCV, and many could not be given to patients with other comorbid diseases.

29.    In 2011, however, the Food and Drug Administration ("FDA") began approving new oral medications, called direct-acting antiviral ("DAA") drugs, which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively. At first, they were designed to work in tandem with

the old treatment regimen. But beginning in 2013, the FDA began to approve DAA drugs that can be taken alone.

30.    As of late-2013, DAA drugs became available for HCV patients.

31.    These DAA drugs have far fewer side effects, dramatically greater efficacy, a shorter treatment duration (12 weeks), and are administered orally (commonly a once-daily pill) rather than by injections. They have truly revolutionized the way HCV is treated.

32.    Most importantly, 90 to 95% of HCV patients treated with any of these DAA drugs are cured, whereas the old treatment regime only helped roughly one third of patients.

33.    For HCV, a "cure" is defined as a sustained virologic response (SVR)— *i.e.*, no detectable HCV genetic material in the patient's blood—for three months following the end of treatment.

34.    In response to the revolutionary DAA medications, the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Disease Society of America ("IDSA") formed a panel of experts to conduct an extensive, evidence-based review of the testing, management, and treatment of HCV. The results of that review have been published in a comprehensive document called the HCV Guidance, which is updated regularly and is available at www.hcvguidelines.org.

35.     The HCV Guidance set forth the medical standard of care for the treatment of HCV, which is well-established in the medical community.

36.     In 2014, the AASLD/IDSA panel, through the HCV Guidance, recommended treatment with DAA drugs for all persons with chronic HCV. The recommendation reflected the continuing medical research showing the safety, tolerability, efficacy, and dramatic benefits of the DAA drugs.

37.     Treatment with DAA drugs has been the standard of care for the treatment of HCV since 2014.

38.     Under this standard of care, treatment with DAA drugs is expected to cure nearly all infected persons.

39.     The benefits of immediate treatment include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, reduction in the likelihood of the manifestations of cirrhosis and associated complications, a 70% reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic improvement in quality of life.

40.     Treatment must be provided timely to ensure efficacy. Delay in treatment increases the risk that the treatment will be ineffective.

### Public Health Benefits of Treatment in Prison

41.     Providing expanded HCV screening and DAA treatment in Florida's prisons would greatly reduce the number of new HCV cases in the community.

Curing the disease while people are in prison would prevent inmates from transmitting it when released, and testing would diagnose numerous individuals who were unaware they were infected, thus allowing them to seek treatment once released.

42.     Studies have shown that providing DAA treatment to everyone with chronic HCV increases long term cost-savings. One study even found that restricting DAA treatment access until patients were in the later stages of fibrosis actually results in higher per-patient costs because, while it may be initially less expensive to delay administering DAAs, over the course of treatment, the follow-up care outweighs the initial costs.

43.     Thus, early DAA treatment has the potential to both drastically reduce the incidence of HCV in the general population and also to reduce the costs associated with serious complications from untreated HCV, such as liver transplants and liver cancer.

## FDC's Statewide Policy and Practice of Not Providing Treatment to Inmates with Chronic HCV

44.     From late 2013, when DAAs first became available, until approximately October of 2017, Defendant FDC had a policy and practice of refusing to provide treatment for chronic HCV.

45.     Defendant FDC enforced such policy and practice despite knowing that the failure to provide DAA drugs to inmates with HCV subjects those inmates to an

unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant FDC has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of inmates infected with HCV, including the Plaintiff.

46.     Despite knowing that DAAs were the standard of care for the treatment of chronic HCV since 2014, Defendant FDC and its medical contractors—including Corizon and Centurion—failed and/or refused to provide DAAs to Plaintiff and thousands of other, HCV-infected inmates throughout the state, in contravention of the prevailing standard of care and with deliberate indifference to the serious medical needs of inmates with chronic HCV in Florida. This policy of refusing to treat HCV was implemented because of the cost of the treatment.

47.     It was not until FDC was court-ordered[1] to begin providing DAAs to HCV-infected inmates that Plaintiff and thousands of other inmates received medically necessary treatment for their chronic HCV.

48.     As a result of FDC's failure and/or refusal to provide DAA drugs, over 100 inmates died of untreated HCV and hundreds more suffered irreparable liver damage.

---

[1] *See Hoffer v. Jones*, 290 F. Supp. 3d 1292 (N.D. Fla. 2017) (granting preliminary injunction); *see also Hoffer v. Inch*, 382 F. Supp. 3d 1288 (N.D. Fla. 2019) (granting permanent injunction).

49.     Defendant FDC also unjustifiably delayed providing treatment to HCV-infected inmates, even though the standard of care requires treatment as early as possible. Delayed DAA treatment increases the risk that the treatment will be ineffective. If treatment is delayed until a patient develops decompensated cirrhosis, a liver transplant may provide the only cure.

50.     At all times relevant hereto, Defendant FDC categorically withheld treatment from FDC inmates with HCV but did not categorically withhold treatment from inmates with other similar diseases or conditions (such as HIV) or from other inmates without similar diseases or conditions.

51.     Defendant FDC had a policy under which inmates with chronic HCV were not provided lifesaving medications for their serious medical need and disability, while inmates with other medical needs and disabilities had access to lifesaving medications.

52.     FDC refused to provide FDC inmates, including the Plaintiff, with the necessary treatment for their HCV, and the only treatment recommended under the prevailing standard of care, because of the cost of the treatment.

### Defendant FDC Deliberately Deprived Plaintiff of Medically Necessary Treatment for His Chronic HCV

53.     Plaintiff has been incarcerated in the Florida prison system since October 30, 2009. He has a history of HCV since prior to the date of his October 30, 2009 incarceration. At his initial intake health screening in or about November 2009,

Plaintiff informed the medical staff at CFRC that he had HCV. Thereafter, a blood draw was performed by medical staff, which confirmed Plaintiff's diagnosis with HCV. Plaintiff was subsequently referred to the Chronic Illness Clinic for his chronic HCV for "monitoring."

54.     Throughout his incarceration, Plaintiff regularly inquired about the condition of his liver and requested treatment for his HCV. All of Plaintiff's requests were denied. Moreover, Plaintiff was not adequately informed of the severity of his liver disease and the substantial health risks associated with chronic HCV.

55.     From approximately November 2009 until March 2018, Plaintiff was only given routine blood draws to monitor his HCV. He was not provided DAAs or any other treatment for HCV even though treatment with DAAs was required under the standard of care since 2014.

56.     DAA medications were available to Defendant FDC upon request. However, Defendant did not recommend, request, or provide DAA drugs to Plaintiff until March of 2018, notably after FDC was sued in federal court in *Hoffer* and ordered to provide DAA treatment to Plaintiff.

57.     Whether an FDC inmate receives DAA treatment almost exclusively relies on the inmate's METAVIR or fibrosis score (F0-F4). Under FDC's guidelines, inmates are then prioritized for treatment based on their fibrosis score, which reflects the stage and progression of their liver disease. Nonetheless, until January of 2018,

Defendant FDC failed to require or perform the necessary tests to determine the stage and progression of Plaintiff's HCV, and thus, whether Plaintiff truly met the criteria for treatment under FDC's guidelines.

58.   It was not until January of 2018—more than eight years after FDC initially diagnosed him with HCV—that Plaintiff was given a FibroSure test to determine his fibrosis score. The results showed a fibrosis score of F4, thus indicating that Plaintiff had cirrhosis. However, Plaintiff's liver was cirrhotic prior to January of 2018. In fact, FDC was well-aware of this fact, as demonstrated by the fact that Plaintiff's medical records throughout his incarceration are replete with documentation of Plaintiff's HCV and his worsening liver function. In particular, Plaintiff's medical records clearly document the fact that Plaintiff suffered from life-threatening cirrhosis of the liver, as well as other countless serious and severe resultant, related, and/or associated medical conditions and effects, including without limitation, severe fibrosis, significant or severe liver inflammation activity, portal hypertension, severely abnormal (*i.e.*, elevated) blood AST and ALT levels and abnormal (*i.e.*, low) blood platelet count, persistent and extreme fatigue and low energy, increased muscle weakness, joint pain, dizziness, abdominal discomfort and distension, poor appetite, and nausea, throughout his incarceration. Despite Plaintiff's clinical presentation, no DAA treatment was provided to Plaintiff at that time, or in the months and years thereafter.

59.     For years Plaintiff was led to believe that he was on the "list" to be treated. However, Defendant FDC refused and/or failed to provide treatment to Plaintiff from November 2009 to March 2018, in part to save costs and increase profits. Treatment was only provided to Plaintiff **after** the Court in *Hoffer* ordered FDC to begin providing DAA treatment to HCV-infected inmates. There was no medical reason or justification for the failure to provide Plaintiff with DAAs prior to his ultimate date of treatment.

60.     Throughout his incarceration, Plaintiff repeatedly and specifically requested medical treatment for his HCV. Defendant FDC refused these requests. In fact, Plaintiff was told that he did not qualify for treatment under FDC's treatment guidelines. Instead, Plaintiff's medical providers merely continued to "monitor" Plaintiff's HCV from November 2009 until FDC was mandated to provided him DAAs in March 2018.

61.     Plaintiff repeatedly requested an accommodation for his chronic, serious, severe, and life-threatening HCV—that is, treatment which could result in a cure for his disability. This request for DAA treatment was a request for a reasonable accommodation in that DAA drugs are the only recommended form of treatment capable of clearing HCV from Plaintiff's body. Nonetheless, FDC failed to recommend, request, or provide Plaintiff with such treatment until March 2018.

62.    Plaintiff's request for DAA drugs as treatment for HCV was a reasonable request for a reasonable accommodation, as FDC is required to provide such medication as treatment for HCV under both the standard of care since 2014 and the United States Constitution.

63.    Despite Plaintiff's HCV-diagnosis, serious, severe, and life-threatening HCV-related conditions symptoms, and repeated requests for treatment, Plaintiff was not provided DAA treatment until November March 2018.

64.    Plaintiff should have received treatment with DAA drugs as early as 2014, in accordance with the prevailing standard of care.

65.    From the outset of his incarceration in November 2009, Plaintiff suffered from well-known, well-documented, serious, severe, and life-threatening cirrhosis of the liver, and other serious complications associated with cirrhosis, due to Defendant's refusal and delay in providing treatment for his HCV.

66.    Plaintiff has suffered and continues to suffer from a variety of symptoms directly caused by or associated with HCV including, but not limited to: persistent and extreme fatigue and low energy, increased muscle weakness, dizziness, joint pain, abdominal discomfort and distension, poor appetite, and nausea. In fact, some days Plaintiff's is unable to muster up enough strength to get out of bed.

67.     Plaintiff has also suffered and continues to suffer from a variety of symptoms or conditions indirectly caused by or associated with HCV including, but not limited to: cirrhosis, severe fibrosis, significant or severe liver inflammation activity, portal hypertension, and severely abnormal (*i.e.*, elevated) blood AST and ALT levels and abnormal (*i.e.*, low) blood platelet count.

68.     Plaintiff was denied DAA treatment for his chronic HCV because those FDC had a statewide policy and practice of not providing DAA drugs to HCV inmates. This policy and practice was implemented for non-medical reasons, including, *inter alia*, the cost of the treatment.

69.     In other words, Defendant's refusal to provide DAA treatment for non-medical reasons constituted a deliberate indifference towards Plaintiff and his serious medical need and disability.

70.     By being denied access to DAA treatment for his HCV by the Defendant FDC, Plaintiff was denied meaningful access to prison programs, services, and activities, including access to medical services.

71.     The irreparable damage suffered by Plaintiff may have been prevented if not for Defendant's unconstitutional denial and delay of treatment for HCV. Plaintiff continues to suffer damages as a result of Defendant's deliberate indifference to his serious medical need and disability.

72.     As a result, Plaintiff has suffered serious, substantial, life-threatening, and permanent injuries, including irreparable liver damage, as a result of Defendant's failure to provide him necessary medical care and treatment for his chronic HCV.

## COUNT I
## TITLE II OF THE AMERICANS WITH DISABILITIES ACT (ADA)
### (Against Defendant FDC)

73.     Plaintiff incorporates and re-alleges paragraphs 1 through 72 as if fully set forth herein.

74.     This count is brought under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101, *et seq.* and 42 U.S.C. §§ 12131–12134, and its implementing regulations.

75.     The ADA prohibits public entities from discriminating against individuals with disabilities in their services, programs, and activities. 42 U.S.C. §§ 12131–12134; *see also* 28 C.F.R. §§ 35.130. In other words, the ADA impose an affirmative duty on public entities to create policies and procedures to prevent discrimination based on disability.

76.     Defendant FDC is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

77.     Plaintiff had chronic HCV, which is a physiological disorder or condition that affects one or more body systems, including but not limited to the

digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. 42 U.S.C. § 12102(1) & (2); 28 C.F.R. § 35.108(a) & (b). This physical impairment substantially limits one or more major life activities, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

78.     In other words, Plaintiff's chronic HCV caused him to have a disability as defined under the ADA. Stated differently, Plaintiff's disability was chronic HCV.

79.     Plaintiff has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment. 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).

80.     Plaintiff is regarded by FDC as having an impairment that substantially limits one or more major life activity, as FDC perceives him as having such an impairment. 42 U.S.C. § 12102(1)(C) & (3); 28 C.F.R. § 35.108(a)(1)(iii) & (f). Defendant FDC has subjected Plaintiff to a prohibited action because of an actual or perceived physical impairment.

81.     Plaintiff was a qualified individual with a disability because he met the essential eligibility requirements for the receipt of services or the participation in

programs or activities provided by Defendant FDC, including but not limited to medical services. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

82.     By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC excluded Plaintiff from participation in, and denied him the benefits of, FDC services, programs, and activities (such as medical services) by reason of his disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

83.     By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC subjected Plaintiff to discrimination. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

84.     DAAs are the only effective medical treatment available for HCV under the prevailing standard of care, and is the constitutionally-required treatment under the Eighth Amendment. Plaintiff requested DAA treatment for his HCV, which was a request for a reasonable accommodation for his HCV. By denying or delaying in providing DAA treatment to Plaintiff, Defendant FDC refused or failed to provide Plaintiff a reasonable accommodation for his request for treatment of his HCV in violation of Title II of the ADA.

85.     Defendant FDC failed to provide Plaintiff with equal access to and enjoyment of effective medical services. 28 C.F.R. § 35.130(b)(1).

86.     Defendant FDC utilized criteria or methods of administration that had the effect of subjecting Plaintiff to discrimination and that defeated or substantially impaired accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. § 35.130(b)(3).

87.     DAAs were readily available to Defendant FDC during this time period and yet it categorically refused to provide Plaintiff with treatment that the medical community deems essential.

88.     Defendant FDC denied and delayed providing Plaintiff with the necessary treatment and reasonable accommodation for his HCV because of the cost of the treatment and accommodation.

89.     Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff. Such violations include but are not limited to:

(a)     FDC's decision to adopt and enforce a policy of not providing treatment to HCV-infected inmates;

(b)     FDC's refusal to provide Plaintiff with necessary medical treatment for his HCV, and the only treatment available under the prevailing standard care;

(c)     FDC's refusal to provide Plaintiff with DAA drugs because of the high, unbudgeted cost of the treatment; and

(d)    To the extent it lacked sufficient funds to purchase and treat HCV-infected inmates like Plaintiff with DAAs, FDC's refusal or failure to even request adequate funding from the Florida Legislature.

90.    Had Defendant FDC not delayed but instead provided Plaintiff with DAA treatment and the reasonable accommodation he requested throughout his incarceration, Plaintiff would not have suffered additional injuries, including both physical injuries and emotional pain and suffering.

91.    Defendant FDC owed Plaintiff a non-delegable duty to ensure that his wellbeing would not be compromised as a result of discrimination based on his disability. As such, Defendant FDC is vicariously liable for the actions of any and all persons or entities Defendant FDC contracted out its medical services to or otherwise designated to care for Plaintiff.

92.    As a direct and proximate cause of Defendant FDC's actions and omissions, Plaintiff has suffered and continues to suffer from harm and violation of his ADA rights.

WHEREFORE, Plaintiff demands judgment against Defendant FDC for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## COUNT II
## SECTION 504 OF THE REHABILITATION ACT (RA)
### (Against Defendant FDC)

93.     Plaintiff incorporates and re-alleges paragraphs 1 through 72 as if fully set forth herein.

94.     This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701, *et seq.* and 29 U.S.C. § 791–794, *et seq.*, and its implementing regulations.

95.     Section 504 of the RA prohibits discrimination against persons with disabilities by any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).

96.     Defendant FDC is a program or activity receiving federal financial assistance within the meaning of 29 U.S.C. § 794.

97.     Defendant FDC excluded Plaintiff—a qualified individual with a disability—from participation in, and denied him the benefits of, programs or activities solely by reason of his disability (chronic HCV). 29 U.S.C. § 794(a); 29 U.S.C. § 705(20); 28 C.F.R. § 42.503(a).

98.     Defendant FDC subjected Plaintiff—a qualified individual with a disability—to discrimination. 29 U.S.C. § 794(a).

99.    Defendant FDC denied Plaintiff—a qualified handicapped person—the opportunity accorded to others to participate in programs and activities. 28 C.F.R. § 42.503(b)(1).

100.    Defendant FDC utilized criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, and defeat or substantially impair accomplishment of the objectives of FDC's programs or activities with respect to handicapped persons. 28 C.F.R. § 42.503(b)(3).

101.    Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff.

102.    As a direct and proximate cause of Defendant FDC's exclusion and discrimination, Plaintiff has suffered and continues to suffer from harm and violation of his RA rights.

WHEREFORE, Plaintiff demands judgment against Defendant FDC for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all counts alleged above.

Respectfully submitted,

**ANDREWS LAW FIRM**
822 North Monroe Street
Tallahassee, Florida 32303
T: (850) 681-6416 / F: 681-6984

*/s/ John M. Vernaglia*
JOHN M. VERNAGLIA (FBN 1010637)
RYAN J. ANDREWS (FBN 0104703)
DAVID A. WEISZ (FBN 1023229)
john@andrewslaw.com
ryan@andrewslaw.com
david@andrewslaw.com
service@andrewslaw.com
*Counsel for Plaintiff*